**Harrison COMBS, John J. O'Connell and Paul R. Dean, as Trustees of the United Mine Workers of America Health and Retirement Funds, Plaintiffs,**

v.

**HAWK CONTRACTING, INC., Defendant.**

Civ. A. No. 82–778.

United States District Court, W. D. Pennsylvania.

July 14, 1982.

---

Jack W. Plowman, Pittsburgh, Pa., for plaintiffs.

Al Lander, Clarion, Pa., for defendant.

## MEMORANDUM OPINION

WEBER, Chief Judge.

This is an action brought under the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. § 1132. The plaintiffs are Trustees of the United Mine Workers of America Pension Funds. The defendant Hawk Contracting, Inc. is a corporation which operates a coal mine in Armstrong County, Pennsylvania. In the course of its operations the defendant entered into several successive collective bargaining agreements with the United Mine Workers of America. As part of these agreements Hawk Contracting was obligated to pay a royalty into the Mine Workers Pension Fund. The amount of this royalty was tied to mine production, with the mine operator paying a specified amount for every ton of coal produced by it for use or for sale.

The plaintiffs are now suing, as fiduciaries for these Funds, to enforce this royalty obligation. According to the plaintiffs' complaint the defendant owes the Funds royalties from September 1, 1977 to the present. This case is before us on plaintiffs' motion for preliminary injunction. In this motion the plaintiffs request that we order the defendant to make full payment into the Funds as required by the applicable collective bargaining agreements. The defendant has responded to this motion, arguing that the payments previously made by it were in accord with the collective bargaining agreements and that the Trustees' acceptance of a lesser royalty acts as an estoppel or an accord and satisfaction.

A hearing was held on this motion on May 27, 1982, at which time the court heard the testimony of several witnesses and entertained the arguments of counsel. Upon consideration of the evidence presented at this hearing, along with the briefs and arguments of counsel, we conclude that a preliminary injunction should issue in this matter. Accordingly we will enter such an injunction.

The record developed at the hearing conducted before this court revealed the following facts: Between 1980 and 1981 Hawk Contracting, Inc., was twice the subject of audits conducted by employees of the Pension Funds. The first of these audits was conducted in the fall of 1980. This was a routine audit conducted to insure that Hawk was making royalty payments in accordance with the collective bargaining agreements. As a result of this initial audit it was concluded that Hawk owed approximately $157,000 in royalties and interest to

the Funds. A demand for payment of these royalties was made to Hawk by Jack Murrin, Assistant Comptroller for the Funds, on February 5, 1981.

Hawk Contracting, through its vice-president, Mr. Donald Gaydos, contested the findings of this audit. Hawk contended that the audit overstated the amount of unpaid royalties because it improperly disallowed a royalty deduction based on the ash content of the coal produced and sold by Hawk.

In order to understand the precise nature of the royalty deduction claimed by Hawk it is important to understand the way in which this company produces and markets its coal. Like many mine operators, Hawk Contracting does not own coal cleaning facilities which remove rocks and other impurities from the coal it produces. Therefore, Hawk must sell its coal to its consumers in its raw-mined state. Many of the impurities found in this raw coal are non-combustible. The presence of these non-combustible materials in the coal reduces its value as a fuel source. Because of the coal sold by Hawk, as mined, contains these non-combustible materials it commands a lesser price on the market.

The National Bituminous Coal Wage Agreement which defines the duty of coal operators to pay royalties, links that obligation to mine production. Under the agreement an operator is required to pay a royalty on each ton of bituminous coal "produced . . . for use or for sale . . .". The calculation of royalties under this agreement is generally based on the gross tonnage removed from the mine. The Fund Trustees have, however, made an exception to this rule in instances involving coal which has been cleaned prior to its use or sale. When a mine operator can demonstrate that it cleaned its coal prior to sale the Fund demands royalties based only on the amount of the clean coal or net tonnage. Defendant Exhibit D. Of course, only miners with coal cleaning equipment can take advantage of this royalties policy.

In its objections to the Pension Fund audit Hawk argued that its ash deduction was simply another way of determining clean coal or net tonnage. Ash is the non-combustible residue that remains when coal is burnt. Hawk took the position that a deduction of this ash content from gross tonnage would accurately reflect the net tonnage of coal sold. Hawk asserted to the auditors that such ash deductions were consistent with the terms of the collective bargaining agreement as interpreted by the Trustees and that they had in the past been allowed by field auditors.

After consideration of this argument, a second audit was conducted by employees of the Fund. In this audit the field auditors were instructed by Mr. Murrin, the Assistant Comptroller, to allow a deduction for the ash content of the coal sold by Hawk. As a result of this ash deduction Hawk's liability to the Fund was adjusted downward from $157,000 to $7,997.49. Defendant Exhibit J. This amount was paid by Hawk into the Funds.

The Trustees now contend that the allowance of this ash deduction by their audit department was improper under the collective bargaining agreement. The Trustees also argue that the Funds' auditors had no authority to permit such an ash deduction. According to the Trustees a preliminary injunction is needed in order to prevent irreparable harm to the trust and its beneficiaries resulting from Hawk's wrongful failure to make full royalty payments.

The defendant has responded by arguing that the ash deduction taken by it is consistent with the agreements as they have been interpreted by the Pension Trustees. The defendant also argues that the Trustees, by their own actions and the actions of their employees, have accepted Hawk's method of calculating royalties. According to Hawk, the Trustees' acceptance of a lesser royalty acts as an estoppel and/or an accord and satisfaction in this lawsuit. The defendant urges, therefore, that we refuse to grant the Trustees any relief in the form of a preliminary injunction.

The decision to grant or deny a preliminary injunction is committed to the sound discretion of the District Court. *In re:*

*Permanent Surface Mining Regulation Litigation*, 617 F.2d 807, 809 (D.C.Cir.1980). The exercise of this discretion is guided, however, by certain basic principles. In passing on any motion for preliminary injunction we must consider, at the outset, the likelihood that the moving party will ultimately prevail on the merits of its claim. But merely demonstrating a likelihood of success on the merits does not, by itself, justify the issuance of a preliminary injunction. We must also consider and weigh the relative harm suffered by the parties and the public as a consequence of any decision to grant or deny injunctive relief. *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 600–601 (3d Cir. 1979).

■ In this case we believe that there is a high likelihood that the plaintiffs/trustees will succeed on the merits of their claim. With respect to the merits of the Trustees' claim Hawk has presented two defenses. First, Hawk argues that the National Bituminous Coal Wage Agreements permit a deduction from royalty payments based on the ash content of the coal produced and sold by a mine operator. Second, Hawk asserts that the actions taken by the Trustees and their employees with respect to these audits act as an estoppel and/or accord and satisfaction in this lawsuit.

We find neither of these arguments persuasive. Turning initially to the defendant's contention that it has acted in accord with the National Bituminous Coal Wage Agreements, these collective bargaining agreements provide for the calculation of royalties in the following manner: "Each signatory employer engaged in the production of coal shall contribute to the funds ... the amount specified below based on cents per ton of each ton of 2,000 pounds of bituminous coal produced by each employer for use or for sale...". The defendant argues that this language authorizes the ash deduction taken by it. The defendant reasons that royalty payments are based solely on bituminous coal production. According to the defendant anything that is ash is not bituminous coal. Therefore, ash content should be deducted from mine production before royalties are calculated.

We disagree. The defendant's narrow focus on the phrase "bituminous coal" entirely misses the thrust of this contractual provision. The Coal Wage Agreement clearly provides that royalties are based on the amount of coal "produced by each employer for use or for sale...". Thus these agreements tie the employer's duty to pay royalties to the quantity of material produced by it for use or sale.

All of the material produced and sold is included in making royalty calculations. *E.g., Lewis v. Owens*, 338 F.2d 740, 742 (6th Cir. 1964); *Huge v. Ondesko*, 415 F.Supp. 816, 820 (W.D.Pa.1976); *Lewis v. Kearns*, 175 F.Supp. 115, 118 (S.D.Ind.1959). Moreover the quality of this coal is wholly irrelevant to the calculation of royalties. As the court in *Lewis v. Kearns* noted, "The language 'produced for use or sale' shows the clear intent of the parties to require payment of royalty to the fund on all production sold as coal regardless of grade." *Id.* at 118. Therefore any coal mine production sold or used as fuel qualifies for inclusion in calculating royalties.

In this case Hawk improperly seeks to introduce a qualitative element into royalty calculations by means of an ash deduction. Hawk attempts to justify this action by equating the ash deduction with the approved practice of calculating royalties on the basis of net tonnage when an employer cleans its coal prior to use or sale.

This comparison cannot survive close scrutiny. The position of a miner who cleans his coal prior to use or sale is inherently different from that of a miner who simply sells raw-mined coal. In the former situation the only material that is being "produced ... for use or for sale ..." is the clean coal. Since the material removed from the coal at the time of cleaning is neither used nor sold it must be excluded from any royalty calculations. In fact, in such a situation assessment of royalties on the basis of gross tonnage might constitute a violation of the National Bituminous Coal Wage Agreement. In contrast when a mine operator sells raw coal directly from

its mine, the mine's production for use or sale is accurately reflected by its gross tonnage. Therefore, in that situation gross tonnage provides the proper measure for assessing royalties.

In addition this comparison fails because it is over-inclusive. Admittedly the rocks and other materials typically removed from coal by cleaning appear as ash if that coal is burned. But so do other impurities, impurities that are not subject to removal by any coal cleaning process. Therefore, the ash deduction claimed by Hawk actually puts it in a better position than that of mine operators who clean their coal prior to sale. This being the case we do not believe that the contract, as interpreted by the Trustees, allows for the type of ash deduction claimed by Hawk.

Nor do we feel that the defendant can assert the defenses of estoppel and/or accord and satisfaction against the Trustees in this case. Hawk Contracting, as an employer and signatory to the National Bituminous Coal Wage Agreement, is obligated to make royalty payments into the Mine Workers' Pension Funds. These royalty payments form an important part of the basic package of compensation owed by contract to all union miners. *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 469, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960). Therefore, Hawk's duty to pay royalties is an obligation which it owes directly to its employees. This duty creates an expectation on the part of these employees that their right to this compensation will not be imperiled by the wrongful acts of any third party.

 The law recognizes the importance of this relationship between employer and employee and the expectations created by it. Accordingly it is held that neither the actions of the Union nor those of the Trustees can defeat this independent obligation of the employer to make royalty payments as prescribed by contract. *Lewis v. Seanor Coal Co.*, 256 F.Supp. 456, 461 (W.D.Pa. 1966), aff'd 382 F.2d 437 (3d Cir. 1967). *See, e.g. Lewis v. Mill Ridge Coal, Inc.*, 298 F.2d 552 (6th Cir. 1962); *Huge v. Old Home Manor, Inc.*, 419 F.Supp. 1019 (W.D.Pa.

1976); *Lewis v. Harcliff Coal Co., Inc.*, 237 F.Supp. 6 (W.D.Pa.1965). Similarly, it is clear that the mere acceptance of royalty payments which do not conform with the contract does not preclude a later suit by the Pension Trustees to strictly enforce that agreement. *E.g. Lewis v. Brock*, 308 F.2d 759 (6th Cir. 1962) (held past practice by Trustees of accepting royalty payment from third parties does not bar suit for deficiency brought against coal operator); *Huge v. Old Home Manor, Inc.*, 419 F.Supp. 1019 (W.D.Pa.1976) (held past practice by Trustees of accepting late royalty payments does not preclude action to require timely payment by coal operators).

In this case we believe that it is clear that the coal wage agreement does not permit the type of ash deduction taken by Hawk Contracting. Therefore, we feel that the auditors acted beyond their authority in allowing such a deduction. In our view the unauthorized acts of these employees cannot defeat the Trustees' claim for full royalty payments.

As for the Trustees themselves, they simply accepted payment by Hawk of an amount claimed due following an audit. This act should in no way serve to diminish the right of Union miners to receive the full compensation to which they are entitled under the National Bituminous Coal Wage Agreement. Therefore in this case the Trustees' acceptance of some $7,900 from Hawk Contracting would not bar a subsequent suit by them for the recovery of additional royalties.

Having determined that the plaintiffs have demonstrated a substantial likelihood of success on the merits, we now consider the risk of harm to the parties and the public arising out of our decision to grant or deny injunctive relief. At the outset we feel that the denial of preliminary injunction would irreparably harm the plaintiffs' and those individuals they represent. The Mine Worker Pension Funds are maintained exclusively through employer contributions. The continued integrity of these Funds is of vital importance to all union mine workers. Therefore, when an employer fails to make

royalty payments, as required by contract, the interest of both the Trustees and the mine workers are imperiled. Finally we can see no prejudice to the defendant in this case if we grant plaintiffs' motion for preliminary injunction. Such an injunction would simply require that the defendant make payments into the Funds in accordance with what we understand to be the terms of the National Bituminous Coal Wage Agreement. Since the defendant is already obligated to make these payments, we see no prejudice resulting from the issuance of a preliminary injunction. Accordingly, we will grant plaintiffs' motion. *See, Huge v. Long's Hauling Co.,* 442 F.Supp. 1041 (W.D.Pa.1977).

At the trial the plaintiffs offered into evidence the audit showing the amount of royalties due, plus interest, based on the plaintiffs' theory of the contract. (Plaintiffs Exhibit 4). The accuracy of this computation was not contested by the defendant, but rather the defendant contended that plaintiffs' theory of computing royalties was in error. Having decided for the plaintiffs on this issue we will award damages in the amount of the plaintiffs' calculation $142,617.18, plus interest in the amount of $46,093.52, plus liquidated damages as provided by 29 U.S.C. § 1132(g)(2) in the amount of $46,093.52.

## ORDER

AND NOW, this 14th day of July, 1982, in accordance with the accompanying Opinion, it is ORDERED that defendant, Hawk Contracting, Inc., comply forthwith with all of the terms of the National Bituminous Coal Wage Agreements of 1974, 1978 and 1981, including, but not limited to the following:

(a) the payment, on or before the tenth of each month, of the royalties due to the plaintiffs based upon each ton of two thousand (2,000) pounds of bituminous coal produced, procured, or acquired for use or for sale,

(b) the payment, forthwith, of the full amount of royalties due to the plaintiffs, without any deduction for ash content, based upon each ton of two thousand (2,000) pounds of bituminous coal produced, procured, or acquired for use or for sale, from October 1, 1980, to date,

(c) the submission, on or before the tenth of each month, of monthly Remittance Advice forms showing the tons of coal produced, procured, or acquired for use or for sale, and the hours worked by classified employees, and

(d) the making available to plaintiffs all records pertaining to the tons of coal produced, procured, or acquired for use or for sale, and the hours worked by classified employees.

It is further ORDERED that the defendant be, and it hereby is, ENJOINED from the disposition of any of its assets other than for a fair and adequate consideration, and in the ordinary course of business, until the final determination of this action.

It is further ORDERED that a final judgment be ENTERED in plaintiffs' favor and against defendant for $142,617.18, plus interest to date in the amount of $46,093.52, liquidated damages in the amount of $46,093.52, for a total of $234,804.22, and it appearing to the Court that there is no just reason for delay, it is expressly DIRECTED that this judgment be ENTERED.

Plaintiffs shall post a corporate surety bond in the amount of $100,000 for the payment of such costs or damages as may be incurred or suffered by defendant, in the event it should hereafter be determined that defendant was wrongfully enjoined or restrained.