### U.S.A.

### v.

### BROOK CONTRACTING CORP. (D.C. Civil No. 82–1362)

### UNITED STATES of America

### v.

### TRI–COUNTY LAND AND COAL COMPANY. (D.C. Civil No. 83–0171)

### Appeal of BROOK CONTRACTING CORPORATION and Tri-County Land and Coal Company.

### No. 84–5607.

United States Court of Appeals, Third Circuit.

Argued March 25, 1985.

Decided April 18, 1985.

Rehearing Denied July 10, 1985.

Leon H. Kline (Argued), Sharon T. Walsh, Philadelphia, Pa., for appellants.

David Dart Queen, U.S. Atty., James J. West, First Asst. U.S. Atty., Harrisburg, Pa., Stuart A. Sanderson, Office of the Sol., Beverly Perry (Argued), U.S. Dept. of the Interior, Washington, D.C., for appellee.

Before ALDISERT, Chief Judge, SLOVITER, Circuit Judge, and MANSMANN, District Judge.[*]

---

[*] Honorable Carol Los Mansmann, of the United States District Court for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

ALDISERT, Chief Judge.

In this appeal by two coal producing companies from summary judgment in favor of the government, we must decide what is meant by the expression "coal produced by surface mining" under the Surface Mining Control and Reclamation Act (SMCRA or the Act), 30 U.S.C. §§ 1201–1328. This is not mere semantic exercise, because upon our decision depends the extent of tonnage upon which a reclamation fee of 35 cents per ton may be levied by the Secretary of the Interior. The government argues, and the district court found, that tonnage of "coal produced" includes the weight of rock, clay, dirt and other debris mined with the "coal" that was delivered by the companies to a coal washing and sizing plant. The companies seem to borrow from Gertrude Stein's "a rose is a rose is a rose" and argue that coal is coal and it means a mineral that is combustible. We conclude that we have jurisdiction to hear this appeal, and that the district court erred in determining that all the material mined by appellants was subject to the reclamation fee. Accordingly, we reverse the judgment of the district court.

### I.

Consolidated actions for collecting reclamation fees were brought by the United States against Brook Contracting Corporation and Tri-County Land and Coal Company in the district court. The complaints alleged that the companies, which have identical corporate offices and are represented by the same counsel, owed $73,930.98 and $24,378.67 respectively in delinquent reclamation fees under the SMCRA. The companies had paid only for the combustible coal that was mined; the government concluded that they owed additional fees for the rock, clay, dirt and other debris that was unearthed in the surface mining

process. The district court granted the government's motion for summary judgment and the companies' appeal followed.

## II.

The SMCRA states in relevant part:

All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior, for deposit in the fund, a reclamation fee of 35 cents per ton of *coal produced by surface coal mining* and 15 cents per ton of coal produced by underground mining or 10 per centum of the value of the coal at the mine, as determined by the Secretary, whichever is less, except that the reclamation fee for lignite coal shall be at a rate of 2 per centum of the value of the coal at the mine, or 10 cents per ton, whichever is less.

30 U.S.C. § 1232(a) (emphasis supplied). The companies contend that the district court accorded an overly expansive meaning to the language "coal produced by surface coal mining." In construing the Act, the district court relied in part on 30 C.F.R. § 837.12 (now codified at 30 C.F.R. § 870.-12):

(a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use, including the products of in situ mining.

(b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

.       .       .       .       .

The companies argue that application of this regulation to support imposition of the reclamation fee on the total tonnage of material mined is an improper extension of the scope of 30 U.S.C. § 1232(a).

Because resolution of this case turns on statutory construction involving the interpretation and application of legal precepts, our standard of review is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981).

## III.

■ As a preliminary matter we decide that we have jurisdiction, properly based on the final judgment rule of 28 U.S.C. § 1291. The government argues that the order appealed from is not final, relying on *UGI Corp. v. Clark,* 747 F.2d 893 (3d Cir.1984). In *UGI,* a mining company sought a declaratory judgment that it did not owe reclamation fees and in a separate action the government sued the company to collect delinquent fees. The actions were consolidated and the district court awarded summary judgment in favor of the government on the declaratory judgment action. We dismissed the mining company's appeal from this order because there was no disposition of the consolidated collection case. The requirements of Rule 54(b), Federal Rules of Civil Procedure, were not satisfied and, therefore, there was no final judgment. *Id.* at 894. The *UGI* case differs from the case before us in which the only underlying action—the government's collection case—has been disposed of in favor of the government.

The government argues, however, that the judgment entered below is not final because the district court did not specify in its order the exact amount of fees owed by appellants. We find this argument unpersuasive. The government alleged in its complaint against Brook Contracting Corporation that "defendant owes the Secretary the total of $73,930.98 in delinquent reclamation fees plus interest at the rate of one percent per month commencing thirty (30) days after the end of the calendar quarter for which reclamation fees are due...." App. at 9a. The government alleged that Tri-County Land and Coal Company "owes the Secretary $24,378.67 in delinquent fees, plus such additional amounts as may be determined upon review of defendant's records," plus interest computed in the manner alleged in the Brook Contracting Corporation complaint. App. at 16a. In its motion for summary judgment the government stated:

[T]he United States of America respectfully requests the Court grant summary judgment in favor of the Plaintiff

and against the Defendants Tri-County Land and Coal Company and Brook Contracting Corporation *in the amounts, plus interests and costs, set forth in the respective complaints* filed in this matter and supported by the affidavits filed with this motion.

App. at 22a (emphasis supplied). The order of July 6, 1984 granted the government's motion for summary judgment. The exact amount of fees that the district court adjudged were owed by the companies can be readily determined by reading the complaint, the motion for summary judgment, and the July order in conjunction with one another.

We refuse to adopt a mechanistic and overly technical view of the final judgment rule contained in 28 U.S.C. § 1291. In *Hattersley v. Bollt*, 512 F.2d 209 (3d Cir.1975), we held that a judgment of contribution against a general contractor in favor of a building owner arising out of a personal injury action was final and appealable notwithstanding the fact that the judgment did not specify a precise amount owed the building owner. *Id.* at 213. The building owner had been adjudged liable to the plaintiffs in an amount of $500,000. The judgment of contribution provided that the contractor would be liable for any amount in excess of $250,000 paid by the building owner to the plaintiffs. We stated:

> [B]ecause the judgment fixes [the contractor's] ultimate liability and clearly establishes the parameters of that liability, it is a final, appealable order. The Supreme Court of the United States has emphasized that "the requirement of finality is to be given a 'practical rather than a technical construction.'" *Gillespie v. United States Steel*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964).

Where the practical effect of a judgment or order is final and only requires a ministerial act to implement it, such judgment or order is appealable under 28 U.S.C. § 1291. Since the effect of this district court judgment settles "the primary issue then existing between the parties," *Massachusetts Casualty Ins.*

*Co. v. Forman*, 469 F.2d 259, 260 (5th Cir.1972), and determines the rights and equities between the parties, it is a final judgment, notwithstanding any provision for future determination of the actual amount of recovery.

*Id.* at 213–214 (footnote omitted). We have no difficulty in holding, based on the language in the government's complaints, its motion for summary judgment and the district court order, and on the strength of *Hattersley*, that the order appealed from is final and that we have jurisdiction under § 1291. We turn now to the merits.

IV.

■ The government urges that we need not go beyond *United States v. Devil's Hole, Inc.*, 747 F.2d 895 (3d Cir.1984), because that case qualifies as "the elusive case on all fours." To trace this metaphor to its original form, "the case runs on all four feet," we conclude that the government has added a leg or two to the facts in that case. In *Devil's Hole*, we affirmed the district court's factual finding that anthracite silt was "coal" and the removal and sale of the silt was "surface mining" and thus subject to the reclamation fee imposed by § 1232(a). The government relies heavily on our affirmance of the Secretary's position that the noncombustible portion of the silt was properly included in calculating the weight upon which the reclamation fee was imposed. The government reasons that the noncombustible rock, clay, dirt and other non-coal material at issue in this case should likewise be included in the weight calculations. The case now before us, however, differs significantly.

In *Devil's Hole*, the district court's finding that anthracite silt was "coal," 548 F.Supp. 451 at 454 (E.D.Pa.1982) was supported in the record by expert testimony and other evidence that anthracite silt was combustible and qualified as "coal" under American Society for Testing and Materials (ASTM) standard 388–77 based on its fixed carbon and BTU content. Numerous tests, including a reflectant's analysis and a point

count analysis, also established that anthracite silt was coal. *Id.* This court affirmed the finding as not being clearly erroneous. 747 F.2d at 897. In the case before us now, however, there is no factual finding supported by expert testimony or any other evidence that the aggregate of material mined by appellants qualifies as coal under the ASTM standards. Accordingly, *Devil's Hole* does not support the government's position.

Were this simply a matter of comparing this case with *Devil's Hole,* our work would be at an end. But the master Cardozo has taught us that deciding cases is much more than a "color-matching" procedure.[1] Appellants argue that the government interpreted and applied the SMCRA too broadly. Accordingly, we turn our attention to the Act's construction.

## V.

Our review of the district court's interpretation of the critical phrase in § 1232(a) is plenary.

As in all cases involving statutory construction, "our starting point must be the language employed by Congress," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337 [99 S.Ct. 2326, 2330, 60 L.Ed.2d 931] (1979), and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9 [82 S.Ct. 585, 591, 7 L.Ed.2d 492] (1962). Thus "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980).

*American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). It therefore devolves upon us to ascertain the legislative intent. "In the interpretation of statutes, the function of the court is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention." *United States v. American Trucking Association,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). But here we will take as our starting point the legislative history, because it is extensive and extremely relevant. *See McCaughn v. Hershey Chocolate Co.,* 283 U.S. 488, 51 S.Ct. 510, 75 L.Ed. 1183 (1931).

### A.

In discerning this history, we are not limited to the Report accompanying the final Act. We are informed by this Report that "[t]he legislative history of H.R. 2 [the SMCRA] includes the history of H.R. 25 ..., S. 425 ..., H.R. 9725 ..., and H.R. 13950 ...." H.R.Rep. No. 218, 95th Cong., 1st Sess. 140, *reprinted in* 1977 U.S.Code Cong. & Ad.News 593, 672. These bills, virtually identical to H.R. 2, were passed by Congress in 1975 and 1976 but vetoed by the President. We have examined that history in detail and conclude that it counsels against an expansive interpretation of the term "coal" and a broad-based imposition of the reclamation fee, as urged by the government. Congress evinced concern that the provisions of the Act—particularly imposition of the reclamation fee—not be burdensome on the coal industry nor fuel inflation in the national economy:

Several principal considerations form the basis for the Title IV reclamation fee:

First, to set the fee at such a level that it is not a burden on the industry;

Second, to provide at the same time sufficient funds for meeting program objectives within a reasonable time frame; and

---

**1.** [Some judges believe that adjudication] is a process of search, comparison, and little more. Some judges seldom get beyond that process in any case. Their notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread upon their desk. The sample nearest in shade supplies the applicable rule. But, of course, no system of living can be evolved by such a process, and no judge of a high court, worthy of his office, views the function of his place so narrowly.
B. Cardozo, *The Nature Of The Judicial Process* 20 (1921).

Third, to structure the fee so·it would ot exert an inflationary influence in the conomy.

at 137, *reprinted* in 1977 U.S.Code ng. & Ad.News at 669. Notwithstand- these explicitly stated considerations, e government urges upon us an expan- ve interpretation of the reclamation fee ovision that is not consistent with the ated "principal considerations".

### B.

The legislative history instructs us that Congress was very much concerned about economic burdens to the economy in gener- al, and the coal industry in particular. Congressional research went to great pains to project costs to the consumers and the industry that would result from implemen- tation of the reclamation fees. These pro- jections strongly suggest that Congress in- tended to impose the fee on combustible coal only, and not, as urged by the govern- ment, on additional tonnages of rock, clay and dirt. For example, the House Report explained the effect that imposition of rec- lamation fees, passed on to the consumer by the coal producers, would have on the manufacturers or distributors of electric power, an industry conceded to be a pri- mary large scale customer of coal produc- ing companies:

> When [the increase caused by imposition of the reclamation fee is] translated into power costs per kilowatt hour—assuming conservative figures of 10,000 Btu's/lb and a conversion rate of 10,000 Btu's/kWh—it is less than 0.015 cents per kWh of electricity. The consumer is utilizing 250 kWh per month, this repre- sents an increase of 4 cents per month on his utility bill. The committee does not consider this small increase a burden on current coal consumers or inflationary in nature.

*Id.* The compelling conclusion is that the "conservative figure" of 10,000 BTU's per pound of coal was based on combustible coal, not on some unspecified combination of coal and rock, clay or dirt. This is clear because the ASTM has classified mineral matter-free coals by rank according to BTU

content, ranging from 6,300 BTU's per pound to greater than 15,500 BTU's per pound. Appendix to Appellants' Brief at 4. Absent a valid factual finding to the con- trary, and there is no such finding in the record before us, we will not conclude as a matter of law that the aggregate of materi- al mined by appellants would have a suffi- cient BTU rating to qualify as coal.

### C.

Still another aspect of the cost studies set forth in the legislative history of the SMCRA suggests that the appellants' prof- fered interpretation of the reclamation fee provision is correct. Detailed analyses were made to ascertain the cost burden on the producers that, of course, would imme- diately be passed on to the consumers. As indicated, Congress projected the tonnage costs with production of heat, and came to the conclusion that there would be 10,000 BTU's per pound of coal, and that the conversion rate to electricity was approxi- mately 10,000 BTU's/kWh. These figures can be transformed into the equation: 1 pound of coal = 1 kWh. Hence, in projec- ting the increase in electric utility bills that H.R. 25 would cause—increased coal costs resulting from both the reclamation fee and compliance with SMCRA's regulatory provisions—Congress reported that a $1.00 increase in a ton of coal translates into a .05 cent increase per kilowatt hour of electricity. H.R.Rep. No. 896, 94th Cong., 2d Sess. 148·(1976) (appendix). It is readily apparent that this figure was computed by assuming that 1 pound of coal = 1 kWh and then merely dividing the 1.00 in- crease/ton by 2000 to arrive at .05 cents. (1.00/2000 = .0005). Obviously this projected increase would be substantially higher if the underlying premise—that one pound of coal is required to produce one kilowatt hour—were rendered incorrect by · the imposition of the reclamation fee on significant amounts of non-energy produc- ing matter.

### D.

But there were even additional cost stud- ies made. Congress compared the in-

creased costs in coal caused by enactment of the SMCRA to the total price of coal per ton. Again, in language reflecting congressional concern that the SMCRA not be financially burdensome on the coal industry, consumers and the general economy, the House Report states:

> The Library of Congress analysis concluded that even using overgenerous estimates of reclamation costs, the price of reclamation is small. If one adds the 35-cent-a-ton reclamation fee to an 85-cent-per-ton reclamation cost, the reclamation cost of $1.20 is only 6 percent of the spot price of $21.49 for 1976. The Library study concluded that the price of coal is not expected to be increased by this amount because coal prices are more reflective of the unusual situation in the energy markets than of small changes in production costs.

H.R.Rep. No. 218, 95th Cong., 1st Sess. 149, *reprinted in* 1977 U.S.Code Cong. & Ad.News 593, 681. There is absolutely no indication that Congress sought to include in the spot price of coal an adjustment for tonnages of non-coal material.

### VI.

Then, too, the views of those members of Congress who dissented from passage of H.R. 25 are relevant. They opposed the Act because they believed 35 cents per ton was too high, and opted for a reclamation fee of 10 cents. They based their argument on the basis that the total tonnage of coal produced in 1975 was 654,000,000 tons. *See id.* at 72, *reprinted in* 1977 U.S.Code Cong. & Ad.News at 610. The dissenting report to H.R. 25 contended that the reclamation fee of 35 cents per ton was too high, "extracting unneeded cash from the

consumer and the money supply...." H.R.Rep. No. 45, 94th Cong., 1st Sess. 163 (1975). The dissenters advocated a fee of 10 cents per ton, stating that this "could generate between $60 and $70 million dollars on an annualized basis." *Id.* at 169. This is a computation based on the tonnage of combustible coal produced. Had these legislators been proceeding on the basis that the reclamation fee of 35 cents was to be applied to more tonnage than the 654 million tons of actual coal produced, that figure would have been included in their argument as an *a fortiori* proposition.

In sum, Congress's analysis of costs associated with imposition of the reclamation fee supports appellants' argument that Congress intended to impose the fee on tonnages of combustible coal only.

### VII.

The definition of coal promulgated by the Secretary likewise militates against the expansive construction adopted by the district court. Title 30, C.F.R. § 700.5 states in pertinent part:

> As used throughout this chapter, the following terms have the specified meaning except where otherwise indicated—
>
> ....
>
> Coal means combustible carbonaceous rock, classified as anthracite, bituminous, subbituminous, or lignite by ASTM Standard D 388–77, referred to and incorporated by reference in the definition of "anthracite" immediately above.

We note that the provisions dealing with the imposition of the reclamation fee do not explicitly "otherwise indicate" an alternative definition of *"coal,"* although 30 C.F.R. § 870.12(b) [2] seemingly permits rec-

---

2. 30 C.F.R. § 870.12(b) states in pertinent part:

 (b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

 (1) The initial bona fide sale, transfer of ownership, or use shall be determined by the first transaction or use of the coal by the operator immediately after it is severed, or removed from a reclaimed coal refuse deposit.

 (2) The value of the coal shall be determined F.O.B. mine.

 (3) The weight of each ton shall be determined by the actual gross weight of the coal.

 (i) Impurities, including water, that *have not* been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator *shall not* be deducted from the gross weight.

 (ii) Operators selling coal on a clean coal basis shall retain records that show run-of-

lamation fee liability to be determined on the basis of the gross weight of *all* mined material at the time of the initial bona fide sale. To the extent that the government interprets § 870.12(b) to authorize imposition of the reclamation fee on the noncoal material mined by appellants here, we hold this regulation exceeds the scope of 30 U.S.C. § 1232(a) and is therefore invalid.

The government relies on *Combs v. Hawk Contracting, Inc.*, 543 F.Supp. 825 (W.D.Pa.1982). At issue in *Combs* was the meaning of a provision in the Coal Wage Agreement obligating employers to pay royalties into the Miners Pension Fund based on the amount of "coal produced by each employer for use or sale." *Id.* at 827. The district court rejected the company's argument that it could deduct the coal's ash content in computing its royalty payment, reasoning that any coal mine production sold or used as fuel qualifies for inclusion in calculating royalties. *Id.* *Combs* does not compel us to adopt the government's position here. First, and most obviously, *Combs* dealt with construction of a contract between the employers and the union. The court's task in that case was to determine the intent of the parties to the agreement. We scarcely need mention that a statute and a contract with similar provisions need not be construed identically because congressional intent may differ from the intent of parties to the contract. Second, the company's argument in *Combs* that the ash content be deducted from the coal weight is qualitatively different from appellants' argument here. Appellants do not seek a reduction in the coal tonnage based on impurities within the combustible coal itself. Rather they seek a reduction based on the weight of the overburden that is mixed with the coal prior to the washing and sizing operations. Much of this debris is loose material that is inadvertently "scooped" from the mine and loaded with the coal. App. at 41a–42a.

mine tonnage, and the basis for the clean coal transaction.

. . . . .

3. Appellants also argue that the reclamation fee provisions as applied violate the equal protec-

## VIII.

We therefore hold as a matter of law, that as used in the statute, "coal produced by surface coal mining" means combustible coal that would qualify as such under ASTM standards and excludes the weight of rock, clay, dirt and other debris in the computation of the reclamation fee.[3] The judgment of the district court will be reversed with a direction to enter judgment in favor of the appellants.

tion component of the due process clause of the 5th amendment. Because we have disposed of this case on statutory grounds, we do not meet this issue.