**DRUMMOND COAL COMPANY, Appellant**

v.

**Donald P. HODEL, Secretary of the Interior.**

No. 85–5827.

United States Court of Appeals, District of Columbia Circuit.

Argued March 7, 1986.

Decided July 22, 1986.

Michael B. Barr, with whom Charles D. Ossola, Washington, D.C., was on brief for appellant.

Albert M. Ferlo, Jr., Dept. of Justice, with whom Alfred Ghiorzi, Dirk D. Snel and Beverly Perry, Dept. of Justice, Washington, D.C., were on brief for appellee.

James T. Hemphill, Washington, D.C., was on brief for amicus curiae, Mining and Reclamation Council of America, urging reversal.

Robert F. Stauffer, Washington, D.C., was on brief for amicus curiae, Nat. Coal Ass'n, urging reversal.

Before MIKVA, STARR, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by SILBERMAN, Circuit Judge.

SILBERMAN, Circuit Judge:

Appellant Drummond Coal Co. challenges a regulation of the Interior Department's Office of Surface Mining (OSM). A full exposition of the facts and procedural history relating to Drummond's challenge appears in the district court's careful and thorough opinion granting the agency's motion for summary judgment. *Drummond Coal Co. v. Hodel*, 610 F.Supp. 1489 (D.D.C.1985). For the reasons stated herein, we affirm the district court's judgment.

The Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201 *et seq.* (1982), upon which the regulation at issue is premised, creates an Abandoned Mine Reclamation Fund to finance the restoration of land and water resources damaged by coal mining. *Id.* § 1231(c)(1). The Fund's principal source of revenue is a fee assessed on each ton of "coal produced" in the United States. Coal operators are required to pay the Secretary thirty-five cents per ton of "coal produced" by surface mining and fifteen cents per ton of coal produced by underground mining, or ten percent of the value of the coal at the mine, whichever is less. *Id.* § 1232(a). Through a revised regulation, the Secretary has mandated that the fee be assessed on the gross weight of coal prior to sale—including impurities such as water which have not been removed. 30 C.F.R. § 870.-12(b)(3)(i) (1985).

Drummond claims that the revised regulation exceeds the Secretary's statutory authority because it includes within the material taxed "excess" moisture attributable to post-excavation rainfall or washing, which

Drummond asserts is not properly regarded as part of "coal." Drummond also argues, in the alternative, that the regulation constitutes an arbitrary and capricious deviation from the Secretary's past practice.[1] We do not find merit in either contention.

The Secretary's initial fee regulations, promulgated in October 1978, were not entirely clear as to what was subject to the tax:

(a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use....

(b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

30 C.F.R. § 870.12(b) (1978). In Alabama (though seemingly nowhere else in the country), certain OSM personnel and at least six Alabama coal companies interpreted this regulation as analogous to Alabama's severance tax. Alabama law permits coal operators to deduct the weight of "excess" moisture—moisture in excess of 2.88% of the total weight of taxable coal.[2] *See* Ala.Code § 40.13–31 (1975); State of Alabama Department of Revenue, *Coal Severance Tax Regulation* (July 13, 1979). This interpretation, by which "excess moisture deductions" were made on approximately seventy percent of the coal tonnage reported by Alabama coal companies to OSM, came to the attention of OSM's Washington headquarters from a number of sources in 1980 and 1981. In response, OSM proposed new regulations in December 1981 to clarify its position:

1. With an exception not here relevant, Section 1276(a)(2) of the SMCRA incorporates the arbitrary and capricious standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982).

2. That percentage represents what Alabama has established as the "inherent" moisture content of coal in Alabama. Coal in its unmined state naturally contains some moisture, along with ash and sulfur. *See A.J. Taft Coal Co. v. United States*, 605 F.Supp. 366, 371 n. 7 (N.D.Ala.1984), *aff'd mem.* 760 F.2d 279 (11th Cir.1985). This contrasts with "non-inherent" or "excess" moisture, which accumulates after coal is extracted

from the ground as a result of immersion in water during the washing process or exposure to rainfall. *See Drummond Coal Co. v. Hodel*, 610 F.Supp. 1489, 1493 (D.D.C.1985). The precise percentage of inherent moisture varies widely from one coal seam to another throughout the United States. *See A.J. Taft Coal Co.*, 605 F.Supp. at 369. Alabama's 2.88% figure for inherent moisture in coal is therefore an approximation that would not hold true even for all coal mined in that State. (OSM has noted, for example, that Alabama's Bureau of Mines found an average inherent moisture of 3.0% for Alabama coal seams).

(3) The weight of each ton shall be determined by the actual gross weight of the coal.

(i) Impurities, including water, that have not been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator *shall not* be deducted from the gross weight.

30 C.F.R. § 870.12(b)(3)(i) (1982) (emphasis in original).

Drummond, one of the Alabama coal companies that had been deducting "excess moisture" in its quarterly fee filings with OSM from 1977 through 1981,[3] contends that the revised regulation, by taxing impurities not removed prior to sale, exceeds the Secretary's authority under the Act. According to Drummond, the SMCRA limits the Secretary to taxing coal with its inherent impurities, *see supra* note 2.[4] The statute does not, in Drummond's view, permit the Secretary to tax that portion of the weight of coal represented by post-extraction added impurities, such as rainwater or debris. Phrased in Gertrude Stein's style, Drummond argues that coal is coal is coal.[5] Congress, however, did not define "coal" in the statute—still less the term "coal produced," upon which the fee is levied. Like the district court, we do not find the ordinary meaning of that term unambiguous: " 'Production' could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction.... [N]owhere does the [SMCRA] specify what elements comprise a 'taxable' piece of coal." 610 F.Supp. at 1497. Drummond's "plain meaning" argument is further undermined by the prevailing industry practice between the passage of the SMCRA in 1977 and the final promulgation of the revised regulations in 1982. According to the record, the vast majority of U.S. coal operators, as well as OSM personnel outside of Alabama, interpreted the phrase "coal produced" as do the revised regulations.

In view of the ambiguity of the statutory language, then, unless Congress in the legislative history specifically disclosed its intent on the question at issue we must defer to the Secretary's construction of the Act. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Drummond contends that the legislative history indeed reveals Congress' intent on the matter at issue here—an intent

---

**3.** Drummond inadvertently omitted the excess moisture deduction from the tonnage report for the last quarter of 1981 and claimed a "refund" in its first quarter 1982 report. OSM denied the refund claim and disallowed any future deductions, but it has not, as far as the record shows, sought to recoup from Drummond the amounts deducted between 1977 and 1981.

**4.** Drummond's position comes close to advocating a Btu tax, because the *inherent* moisture and ash in coal also add nothing to its value as determined by the Secretary. Yet Congress rejected a Btu tax in the final version of the SMCRA. Its sole concession to a tax based on the heat value of coal was the provision whereby if 10% of the value of surface-mined coal at the mine, as determined by the Secretary, is less than 35 cents per ton, then the lesser figure is paid into the reclamation fund. *See* 30 U.S.C. § 1232(a); H.R.Rep. 218, 95th Cong., 1st Sess. 137, U.S.Code Cong. & Admin.News 1977, p. 669. The House Report stated that "only a small proportion of the low-heat sub-bituminous coal will be eligible for this reduced fee." *Id.* The contrast between this provision, based on heat value as determined by the Secretary, and the weight-based provision under which

Drummond is taxed cuts strongly against Drummond's position in this case.

**5.** In support of its argument, appellant relies on the reasoning of *A.J. Taft Coal Co.*, 605 F.Supp. at 366. In that case, the district court found that the Black Lung Tax on "coal sold by the producer" required the exclusion from gross weight of moisture in excess of the Alabama statutory 2.88% limit. Relying upon the "plain meaning" of the word "coal," the district court adopted the State's 2.88% severance tax standard. The *Taft* court distinguished the holding in *Drummond Coal Co. v. Watt*, No. CV82–H–1838–S (N.D.Ala. May 18, 1983) [Available on WESTLAW, DCTU database], with whose reasoning we today agree, by reference to the fact that the agency administering the Black Lung Tax had issued no clarifying regulations, and that there was "no clear intent in [the Black Lung Tax statute], as there was in the [revised OSM] regulation, to tax water or any other 'impurities.' " 605 F.Supp. at 371. To the extent that *Taft's* rationale nevertheless may implicitly contradict our own, we respectfully disagree with it.

inconsistent with the Secretary's regulations. In support of this contention, Drummond deploys the Third Circuit's decision in *United States v. Brook Contracting Corp.*, 759 F.2d 320 (3d Cir.1985). Our review of the relevant legislative history[6] leads us respectfully to disagree with the Third Circuit and agree with the district court below. *See* 610 F.Supp. at 1501 n. 9. The legislative history simply does not disclose the requisite specific intent upon which a court could properly rely to overturn the Secretary's regulations.[7]

Congress in fact never addressed the particular issue that we confront in this case. The House Report reflects general concern, in connection with the level of the reclamation fee to be assessed, with the burden placed on the industry and consumers and with the inflationary impact of the fee. *See* H.R.Rep. No. 218, 95th Cong., 1st Sess. 137, *reprinted in* 1977 U.S.Code Cong. & Ad.News 669; *see also Brook*, 759 F.2d at 324–25 (discussing House Report). Those considerations were explicitly balanced, however, against the need to raise sufficient funds to meet program objectives. *Id.* In any event, we fail to see how the general policy concerns relating to the impact on industry and consumers—even standing alone—could be dispositive of the issue before us.

In support of its holding the *Brook* court reviewed occasions, during the three years of legislative deliberations leading to the 1977 passage of the Act, when Congress considered estimates of the ultimate cost of the reclamation fee to industrial purchasers of coal and consumers. *Id.* at 325–26. These estimates used rough ("conservative") assumptions about the number of Btu's per pound of coal—assumptions that the Third Circuit regarded as more consistent with "clean" coal than with coal that includes some amount of non-inherent impurities. *Id.* at 325. Congress also considered certain calculations based on the spot price per ton of coal, in which there was apparently no indication that the price had been adjusted to reflect the existence of such impurities. *Id.* at 325–26. Finally, the *Brook* court cited the arguments of members of Congress advocating a lower, ten-cents-per-ton fee, premised on gross revenue calculations for total 1975 coal tonnage which the court thought to be exclusive of noninherent moisture and debris. Even if the scientific and mathematical calculations upon which the *Brook* court's analysis is founded are correct,[8] they do

---

**6.** The House Report states that the legislative history of the SMCRA would include the legislative history of previously vetoed versions of the enactment from the two prior Congresses. H.R.Rep. No. 218, 95th Cong., 1st Sess. 140, *reprinted in* 1977 U.S.Code Cong. & Ad.News 593, 672.

**7.** There is, moreover, reason to doubt that the Third Circuit had jurisdiction over the suit in *Brook*. The Eleventh Circuit has held that Section 1276(a)(1) of the SMCRA vests exclusive jurisdiction to review challenges to national regulations, like the regulations at issue here and in *Brook,* in the federal courts of the District of Columbia Circuit. *Drummond Coal Co. v. Watt,* 735 F.2d 469, 476 (11th Cir.1984). We are not compelled in this case to address this jurisdictional question. As the district court pointed out, it is indisputable that Section 1276(a) vests *either* concurrent or exclusive jurisdiction over suits like this in the United States District Court of the District of Columbia. Regardless of which interpretation is correct, the district court properly exercised jurisdiction over this case, and, therefore, so does this Court. 610 F.Supp. at 1494–95.

**8.** The calculations reviewed by Congress assume 10,000 Btu's per pound of coal, whereas the *Brook* court cites figures compiled by the American Society for Testing and Materials (ASTM), the principal source for industry data, for a range running from 6,300 to more than 15,500 Btu's per pound of coal. *See* 759 F.2d at 325. Congress may have chosen the 10,000 Btu's per pound figure rather than a higher one to take account of the presence of non-inherent moisture or debris. Similarly, the Third Circuit states that "[t]here is absolutely no indication that Congress sought to include in the spot price of coal an adjustment for tonnages of non-coal material," *id.* at 326. This seems to assume, without citation of support, that the 1975 spot price was per ton of clean coal rather than for "run-of-mine" coal, *i.e.,* coal prior to the removal of non-inherent impurities. Finally, the House Report's figure for total 1975 coal production of 654 million tons which the *Brook* court cites, *see id.,* multiplied by the ten-cents-per-ton fee proposed by the House minority, would yield $65.4 million; yet the court quotes the minority report as claiming that the minority's proposed ten cent fee "could generate be-

not establish, as *Chevron* requires, a specific congressional intent as to the interpretation of the words "coal produced." The Third Circuit's opinion appears to us to be based merely on speculative inferences from the legislative history harnessed to a conviction that the Secretary's regulation will cost too much.[9] Since Congress did not explicitly address the proper meaning of the words "coal produced" in either the statutory language or the legislative history, we conclude that the Secretary was authorized to give the term a reasonable construction. By leaving the operative statutory terms undefined and delegating broad rulemaking authority to the Secretary, *see* 30 U.S.C. §§ 1211, 1242(a) (1982), Congress has left a gap in the regulatory regime for the agency to fill. *See Chevron*, 467 U.S. at 842–44, 104 S.Ct. at 2781–83; *Montana v. Clark*, 749 F.2d 740, 745 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). And in formulating a definition of "coal produced," the Secretary is entitled to balance the countervailing policies at stake. *See Chevron*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83. We have no warrant to set aside the Secretary's interpretation, if reasonable, merely because we might strike this policy balance in a different fashion.

One cannot say that the Secretary's definition is unreasonable. The Secretary felt that important administrative considerations supported his interpretation: "[I]f moisture deductions were allowed, audit of operator records would be further complicated and laboratory analyses required to document moisture content." 47 Fed.Reg. 28,578 (1982). Further, he deemed it desirable to achieve "uniform application of Part 870 and equitable treatment of all operators." *Id.* Drummond contends that whatever administrative problems the Secretary would encounter elsewhere in the country, OSM's Alabama regional office would be able to police deductions for non-inherent post-excavation moisture, presumably because of the apparatus already in place for administering Alabama's severance tax, which requires measurement of the total moisture content of coal for comparison with the 2.88% figure established in the statute.[10] But the Secretary's desire to employ a national standard that uniformly prohibits deductions for post-excavation moisture is obvious commonsense. The inherent moisture of coal varies considerably among coal deposits in different parts of the country. Allowing excess moisture deductions for producers in all parts of the country would entail either the considerable burden of setting differing inherent moisture levels for different localities or the inaccuracy (and inequity) of setting a single, approximate nationwide standard. And even if the percentage of *inherent* moisture in coal were uniform across the nation, or some approximate figure were selected, Drummond still has not suggested how the Secretary could avoid conducting complex and extensive audits to determine the accuracy of operators' measurements of *non-inherent* moisture and debris.

Drummond further contends that the Secretary's revised regulation is inconsistent with the definition of coal as "combusti-

tween $60 and $70 million dollars [sic] on an annualized basis." *Id.* (quoting H.R.Rep. No. 45, 94th Cong., 1st Sess. 168 (1975)). We cannot say that this differential was not included in whole or in part to account for the fee falling on certain quantities of non-inherent moisture or debris.

9. Nor could it be argued, as the *Brook* court seems to suggest, that under the revised regulation the fee would as a practical matter be imposed on an unlimited amount of impurities. If the amount of non-inherent moisture or other debris in coal reaches a point where the portion of the fee ascribable to such impurities exceeds the cost of "cleaning" the coal, then the opera-

tors will of course remove the impurities rather than pay the fee.

10. Alabama is seemingly unique in the "excess moisture" provisions of ·its severance tax. *Drummond Coal Co. v. Watt*, No. CV 82–H–1838–S, slip op. at 3 (N.D.Ala. May 18, 1983) [Available on WESTLAW, DCTU database]. Throughout Drummond has ignored the non-inherent *debris* mixed with the coal, although the logic of their position would apply to all impurities. *See Brook*, 759 F.2d 320 (3d Cir.1985). Drummond apparently avoided making this argument because the Alabama severance tax provides a mechanism only for calculating excess moisture.

ble carbonaceous rock" found elsewhere in the regulations. *See* 30 C.F.R. § 700.5 (1985). Appellant ignores the fact that this definition is prefaced by the words, "except where otherwise indicated." *Id.* The revised regulation clearly "otherwise indicate[s]" that impurities included in the gross weight prior to sale are to be treated as "coal" for purposes of the tonnage fee. This argument, moreover, like Drummond's statutory argument, overlooks the point that the crucial statutory language is "coal produced," not coal.

\* \* \* \* \* \*

Drummond also maintains that even if the Secretary's interpretation would be reasonable if adopted initially, it is nevertheless arbitrary and capricious because when promulgated in 1982 it constituted a change of policy without adequate explanation. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Drummond thus seek to leverage the benefit of the "Alabama interpretation" it enjoyed for four years into a national policy which it asserts OSM cannot so easily change. We find this argument, to put it kindly, insubstantial. There was certainly no national policy reflecting Drummond's interpretation of the statute. The Secretary has represented to us that only twelve of 6000 operators took advantage of this "policy," eleven of whom were based in Alabama. At most, the record reflects some degree of confusion prior to 1982 at the lower echelons of OSM.[11] At the national level the agency's position has been unchanged since 1977. *See* 42 Fed.Reg. 62,714 (1977); 610 F.Supp. at 1503.

We do not say that the Secretary is or was forbidden to adopt Drummond's suggested definition of "coal produced." Rather, we hold that because Congress had

no specific intention on this point, the Secretary, under *Chevron*, had the authority to fashion a reasonable interpretation. This the Secretary has done. The judgment of the district court is therefore

*Affirmed.*

---

11. Drummond doubts the Secretary's representation and seeks to impose a burden on the Secretary to affirmatively "prove" that all but 12 coal operators followed his policy prior to 1982 —which, of course, would require the Secretary, in order to support his position here, to conduct an enormously burdensome audit of thousands of quarterly reports. But the precise number of

confused coal operators is patently irrelevant. Drummond's position seems to us to stem from a profound misunderstanding of *State Farm's* rationale. That case does not hold that an agency is restricted in clarifying an ambiguous regulation that does not precisely convey an agency's statutory interpretation.