**DRUMMOND COAL COMPANY, Plaintiff,**

v.

**Donald P. HODEL,\* Secretary of the Interior, Defendant.**

**Civ. A. No. 82–2439.**

United States District Court, District of Columbia.

June 11, 1985.

---

\* Pursuant to Fed.R.Civ.P. 25(d), Donald P. Hodel has been substituted for William P. Clark as Secretary of the Interior.

Michael B. Barr, Hunton & Williams, Washington, D.C., for plaintiff.

Alfred T. Ghiorzi, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Before the Court are the parties' cross motions for summary judgment. The plaintiff, Drummond Coal Company, seeks declaratory and injunctive relief to prevent the Department of Interior (DOI) and the Office of Surface Mining (OSM) from enforcing regulations designed to govern the collection of reclamation fees under the Surface Mining Control and Reclamation Act of 1977 (SMCRA, the Act), 30 U.S.C. § 1201, *et seq.* At issue is a recently revised regulation that determines the method by which the plaintiff must calculate the fee it is required to pay under the Act for each ton of coal produced. Drummond contends that this revision, undertaken to clarify existing regulations, is both inconsistent with the language of section 402 of SMCRA (30 U.S.C. § 1232) and contrary to prior administrative practice and policy. The defendant, in turn, argues that the revised regulation is "not repugnant to the language of the statute or its underlying purposes" and is consistent with prior practice. As such, the defendant concludes, the promulgation of the challenged regulation falls within the scope of DOI's broad rulemaking power and is entitled to "great deference" upon review by this Court.

For the reasons set forth below, the Court concludes that the Secretary did not exceed his authority in promulgating the challenged regulations. Accordingly, the defendant's cross-motion for summary judgment shall be granted.

### I. *Background*

#### A. *Regulatory Framework*

In 1977 Congress passed the Surface Mining Control and Reclamation Act. The purpose of the Act, as stated by Congress, was in part to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). It was Congress' hope that the Act would "promote the reclamation of mined areas" while striking a "balance between protection of the environment ... and the Nation's need for coal." 30 U.S.C. § 1202(f).

To achieve this end, Congress included in the Act a provision establishing an "Abandoned Mine Reclamation Fund". 30 U.S.C. § 1231. The terms of the fund program, as set out in section 1232(a) of the Act, required all coal operators subject to the SMCRA to pay into the fund a reclamation fee of 35 cents for each ton of coal produced by surface mining.

In December, 1977 the Secretary of the Interior, acting through OSM, promulgated national regulations setting forth the procedures to be used by coal mine operators in computing their reclamation fees. 42 Fed.Reg. 62715 (1977). The regulations stated in pertinent part that:

(a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use, including the products of in situ mining.

(b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

These regulations,[1] however, did not explain precisely how the "weight and value" of the coal at the time of initial sale or transfer was to be calculated. As a result, from 1977 to 1981 the regulations were subject to varying interpretations, both by operators and by certain OSM officials. In Alabama, for example, coal operators regularly reduced their "taxable" coal tonnage by claiming a deduction for the alleged "excess moisture" content of the coal.

Faced with evidence of confusion among operators and inconsistent interpretation by the OSM representatives, in December, 1981 the Secretary proposed revised regulations for reclamation fee computations. The revised regulations, ultimately ap-

---

1. The regulations promulgated in December, 1977 were incorporated in the final regulations issued nearly one year later. *See* 30 C.F.R. 870.12(b), 43 Fed.Reg. 49940 (1978).

proved in final form and codified at 30 C.F.R. § 870.12(b)(3)(i) (1982), stated in relevant part that:

(a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use, including the products of in situ mining.

(b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.

. . . .

(3) The weight of each ton shall be determined by the actual gross weight of the coal.

(i) Impurities, including water, that *have not* been removed prior to the time of initial bona fide sale, transfer of ownership, or use by the operator *shall not* be deducted from the gross weight. [Emphasis added.]

It is these 1981 revised regulations that serve as the focus for the plaintiff's challenge in this case. Before turning to the merits of Drummond's claim, however, a brief review of the coal company's involvement in this litigation is required.

B. *Factual and Procedural History*

Drummond Coal Company, a Delaware corporation, mines substantial amounts of coal in Alabama. Beginning in 1977 when the reclamation fee regulations were first issued, and continuing until June, 1982 when the revised regulations were promulgated, Drummond routinely subtracted a deduction for moisture from the actual tonnage of coal mined, before calculating the reclamation fee it believed was owing. The deductions were approved without exception by the OSM official responsible for the OSM region ("Region II") in which Alabama was located. Five other Alabama based coal producers also followed this practice. The operators insisted that their

calculations were based on an Alabama state coal severance tax law [2] that permitted an excess moisture deduction.

According to OSM, it was not until March, 1981 that the Secretary discovered that certain operators were subtracting a deduction for moisture. Drummond's practice, in particular, did not come to the attention of the Secretary until March 13, 1982, when Drummond filed its report with OSM for the first quarter of 1982. In that report, Drummond explained that it had inadvertently failed to take a moisture deduction for December, 1981 tonnage, and that it expected to receive a credit for the "overpayment" of reclamation fees.

In March, 1981, before Drummond's practice came to light, the Deputy Director of OSM ordered an investigation of the fee collection method used in Region II. (*See* Secretary's Record Supplement, Exhibit D). The results of that investigation—revealing a unique, albeit accepted, practice of excess moisture deductions in Alabama—sparked a policy decision at the highest levels of OSM to bring Region II and Alabama in line with what the Secretary argues had always been OSM's nationally accepted method of fee calculation. Accordingly, in December, 1981 OSM promulgated the revised regulations. OSM notified Drummond on July 23, 1982, that OSM regulations did not permit an "excess moisture" deduction. Citing the revised regulations, OSM informed Drummond that "the deduction claimed . . . for the fourth quarter of 1981 and all subsequent quarters is disallowed. . . . Any future requests for refund of fee payments should . . . not [be] 'offset' by reduced payments in subsequent quarters." Secretary's Record Supp. Exh. C.

Drummond responded immediately to OSM's decision by filing two separate actions simultaneously—one in the Northern District of Alabama, *Drummond Coal Co.*

---

**2.** Alabama's excess moisture provision sets a flat figure—2.88% of the gross weight of mined coal—as the "inherent moisture" content of the coal. Any moisture content over and above

2.88% may be deducted from the gross taxable tonnage. Ala.Code § 40.13-31. *See* Coal Severance Tax Regulations, State of Alabama, Dep't of Revenue, Montgomery, Ala., July 9, 1979.

*v. James Watt*, No. CV82–H–1838–S (slip op. May 18, 1983), and the other before this Court. The complaints, identical in all substantive respects, sought declaratory relief and injunctive relief. Specifically, Drummond requested that the revised 1982 regulations be declared and adjudged "arbitrary, [and] capricious[,] ... an abuse of the Defendant's discretion[,] and ... inconsistent with ... [the] SMCRA." Plaintiff's Complaint at 7. The complaint further requested that the defendant be permanently enjoined and restrained from enforcing or applying the challenged regulations.

At the heart of Drummond's objection to OSM's action was its belief that a coal operator should not be taxed for excess moisture added to the coal after severance and extraction from the ground. According to Drummond, coal was often exposed to water in the mine, or to rain, after severance and before sale. Absorption of this water might add to the gross weight of the coal, but not its value. It made little sense, Drummond argued, to tax an operator based on a gross weight that did not reflect the true quantity of coal removed from the ground.

Insofar as the SMCRA was designed to tax coal and not water, Drummond insisted, the revised regulations exceeded the scope of the Act and thus were unlawful. More importantly, Drummond noted, between 1977 and March, 1982, OSM never objected to a request from a Region II operator for a moisture deduction. From Drummond's perspective, therefore, the 1982 revised regulations represented a departure from a prior administrative practice without a "reasoned justification". Plaintiff's Motion for Summary Judgment at 16–17. As such, the Secretary's decision to promulgate the regulations was arbitrary and capricious, and constituted an abuse of discretion. For these reasons, Drummond argued, the regulations should be held void.

Shortly after the filing of the complaints, the Secretary filed a motion in the Northern District of Alabama to dismiss or transfer the Alabama case on the ground that the SMCRA provided for exclusive jurisdiction in the District of Columbia. On January 13, 1983, the Alabama court denied that motion. One week later, the Secretary requested a permanent injunction to prevent further prosecution in the Northern District of Alabama. Drummond opposed that motion by moving to stay all proceedings in the District of Columbia pending the outcome of the suit in the Northern District of Alabama. On February 24, 1983, this Court granted Drummond's motion to stay.

In response to Drummond's challenge on the merits, the Secretary asserted two central claims. First, the Secretary argued that the revised regulations did not represent a change from prior administrative practice because Region II officers—allegedly the only officers to approve excess moisture deductions [3]—were never *authorized* to grant deductions. Actions, of these "insubordinate" officials, the Secretary insisted, could neither bind DOI nor constitute the Department's official administrative practice or policy.

Second, the Secretary argued that the regulations were entitled to "great deference" on review because they were consistent with the broad, remedial purposes of the SMCRA, and promoted the twin agency goals of uniformity in application and administrative efficiency. Specifically, the Secretary maintained that the ambiguity of the 1977 regulations permitted certain coal operators to pay less tax by contracting to sell coal based on its "energy value" per ton, as opposed to its gross weight. The 1982 revised regulations, the Secretary pointed out, merely ensured that all operators would be taxed on the same basis and at the same point in the coal mining process; the new regulations, therefore, were national in both purpose and design. The

---

**3.** According to the Secretary, only 12 out of 6000 coal operators nationwide were permitted to take deductions, and 11 of the 12 were based in Alabama; the other was in Pennsylvania.

decision to promulgate could not be considered arbitrary or capricious.[4]

Subsequently, the United States District Court for the Northern District of Alabama ruled that the 1982 revised regulations were valid. That court concluded that the new regulations did not constitute a "substantive change in the policy of the agency," but rather represented a clarification of the SMCRA "so as to ensure uniform application of the law." *Drummond Coal Co. v. James G. Watt,* CV 82–H–1838–S (Slip op., N.D.Ala. May 18, 1983 at 6). The Court also found that the regulations were not inconsistent with the plain language of the Act:

> The regulations are invalid, Drummond argues, because they tax impurities such as water, while the Act authorizes a tax only on coal. This argument is not persuasive. The revised regulations are clearly within the scope of the agency's authority under the Act. Congress chose to tax tonnage of "coal." Obviously there are impurities mixed with coal—dirt, sulfur, water, etc. Congress made no attempt to remove from taxation this small percentage of impurities found in the mined coal. Had Congress been concerned that the inclusion of impurities would work an undue hardship on the coal operators, the tax could have been calculated in other ways. For example, Congress could have taxed the coal on its BTU content. Since Congress refused to distinguish coal from its impurities, the regulation requiring the inclusion of impurities in calculating gross weight at the time of initial sale, transfer, or use, is within the scope of the agency's authority. The fact that the impurities involved here are "added" to the coal after it is mined does not change the result. Again, Congress was well aware that

after mining and before sale or use, coal is exposed to water from a variety of sources.

*Drummond,* slip op. at 7.

On appeal, the United States Court of Appeals for the Eleventh Circuit reversed and vacated the Alabama district court decision. Although the Court expressed its "belie[f] that Drummond's challenge to the revised regulations is wholly without merit," the basis of the decision to reverse and the actual *holding* of the case were limited to the conclusion that section 1276(a)(1) of the SMCRA "vests in the United States District Court for the District of Columbia exclusive jurisdiction over th[e] case." *Drummond Coal Co. v. Watt,* 735 F.2d 469 (11th Cir.1984).

With the Alabama litigation complete, this Court lifted the earlier stay. Thereafter, cross motions for summary judgment were filed on the very issues that the Eleventh Circuit found itself without jurisdiction to review. It is to these motions that the Court now turns.

## II. *Jurisdiction*

Before reaching the merits of Drummond's claim, a jurisdictional question need be addressed. 30 U.S.C. § 1276(a)(1) states that:

> Any action of the Secretary to approve or disapprove a State program or to prepare or promulgate a Federal program pursuant to this chapter shall be subject to judicial review by the United States District Court for the District which includes the capital of the State whose program is at issue. *Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, and 1273 of this title shall be subject to judicial review in the United States District Court for the District of Co-*

---

**4.** Because the Secretary never attempted to recover the sums deducted by the Alabama operators from 1977 to 1981, Drummond limited its challenge to the validity of the 1982 revised regulations. As best as can be determined, the plaintiff has challenged only the prospective enforcement of the 1982 regulations. Accordingly, this decision does not purport to address the validity of the 1977 regulations, or the propriety of the Secretary's actions carried out under those regulations.

*lumbia Circuit.* Any other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located. Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law. A petition for review of any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action, or after such date if the petition is based solely on grounds arising after the sixtieth day. Any such petition may be made by any person who participated in the administrative proceedings and who is aggrieved by the action of the Secretary. [Emphasis added.]

Before the Eleventh Circuit, Drummond argued that this section conferred concurrent jurisdiction over the case on the United States District Court for the District of Columbia and on "all other district courts that otherwise would have jurisdiction...." The Eleventh Circuit disagreed with this interpretation, accepting instead the Secretary's argument that Congress intended to vest *exclusive* jurisdiction over challenges to national regulations in the District Court for the District of Columbia. The Eleventh Circuit drew support for its conclusion from a decision by the Fourth Circuit, *Tug Valley Recovery Center v. Watt*, 703 F.2d 796 (1983), but noted that other circuits had reached the opposite conclusion. *See, e.g., Holmes Limestone Co. v. Andrus*, 655 F.2d 732 (6th Cir.1981), *cert. denied sub nom. Watt v. Holmes Limestone Co.*, 456 U.S. 995, 102 S.Ct. 2280, 72 L.Ed.2d 1292 (1982).

For the purposes of this suit at this point in the proceedings, it matters little whether the jurisdictional decision of the Eleventh Circuit in the "duplicate" case filed in Alabama would or would not be held appropri-

ate upon review by the Supreme Court. Regardless whether this Court has *concurrent* or *exclusive* jurisdiction, the statute plainly provides the District Court for the District of Columbia with jurisdiction *in some form* over a challenge to national regulations. The cross motions for summary judgment, therefore, are properly before the Court.

### III. *Consistency, Legislative Purpose, and Prior Practice*

Under the strict standard established by this Circuit, a motion for summary judgment may be granted only when it is shown that there "is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.... In ruling on a summary judgment motion, the Court must draw all inferences from the record in the light most favorable to the party opposing the motion." *Williams v. Washington Metropolitan Area Transit Authority*, 721 F.2d 1412, 1414–15 (D.C. Cir.1983). "To warrant summary judgment the record 'should show the right of the [movant] to a judgment with such clarity as to leave no room for controversy....'" *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1262 (D.C.Cir.1972).

In this instance, neither party disputes the validity of the evidence contained in the administrative record. The sole issues that remain for resolution are legal ones: (1) whether the decision to promulgate the 1982 revised regulations constitutes an unlawful abuse of discretion on the part of the Secretary because the regulations are inconsistent with the language and purposes of the Act; and (2) whether the Secretary's decision to promulgate the revised regulations should be held arbitrary and capricious insofar as it represents a change in prior administrative practice for which no reasoned justification has been offered. Disposition of the suit on summary judgment, therefore, is proper.

#### A. *Statutory Language and Legislative History*

##### 1. *The "Deference" Standard*

It is well established that when faced with a problem of statutory construc-

tion, "great deference [must be shown] to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See also EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980). Deference becomes all the more important when the interpretation of an administrative regulation is involved. *Id.* In that instance "'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed.2d 1700 (1945), *quoted in Udall*, 380 U.S. at 16–17, 85 S.Ct. at 801–802.

■■■■ To sustain the agency's interpretation, the Court "need not find that [the agency's] construction is the only reasonable one, or even that it is the result [that] would have [been] reached had the question arisen in the first instance in judicial proceedings." *Udall*, 380 U.S. at 16, 85 S.Ct. at 801. To the contrary, the burden rests with the party challenging the administrative action to demonstrate invalidity. "Absent a contrary indication in the statute," the Secretary's judgment must be accepted. *In Re: Permanent Surface Mining Regulation*, 653 F.2d 514, 522 (D.C.Cir.1981). As both the Supreme Court and this Circuit have noted,

> it is not a reasonable canon of interpretation [to assume] that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected.... [This] is precisely one of the reasons why regulatory agencies ... are created, for it is the fond hope of their authors that they bring to their work the expert's familiari-

ty with industry conditions which members of the delegating legislatures cannot be expected to possess.

*American Trucking Ass'n v. United States*, 344 U.S. 298, 309–10, 73 S.Ct. 307, 314, 97 L.Ed. 337 (1953), *quoted in In Re: Permanent Surface Mining*, 653 F.2d at 522. *See also Miller v. Youakim*, 440 U.S. 125, 145 n. 25, 99 S.Ct. 957, 969 n. 25, 59 L.Ed.2d 194 (1979); *Maryland National Capital Park and Planning Comm'n v. Lynn*, 514 F.2d 829, 834 (D.C.Cir., 1975) (burden rests on challenging party to overcome presumption of validity).

Application of the *Bowles* Court's "rebuttable deference" standard of review is particularly appropriate in this instance because the drafters of the SMCRA clearly intended to delegate to the Secretary broad rulemaking power. Section 201(c)(2) (30 U.S.C. § 1211) of the Act states that the Secretary shall "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this Act." Similarly, section 412 (30 U.S.C. § 1242) of the Act provides that the Secretary "shall have the power and authority, if not granted it otherwise, to engage in any work and to do all things necessary or expedient, including promulgation of rules and regulations, to implement and administer the provisions of this Subchapter." 30 U.S.C. § 1242(a).[5]

Even were Congress not to have granted the Secretary broad discretion in administering the Act, a "deference" standard of review would still be presumptively appropriate here because the regulatory framework underlying the SMCRA is the product of a long and complex legislative process:

> Deference to the administering agency is particularly appropriate when a complex regulatory statute emerges from a process of difficult legislative gestation. The Surface Mining Act was the result of

---

**5.** Indeed, as the defendant points out, the phrase "all things necessary or expedient" is rarely used by Congress. *See* Defendant's Mem. at 14, n. 11. Congress' decision to use that phrase in this instance, therefore, connotes a deliberate effort to delegate broad discretion to the Secretary for enforcement of the Act.

a protracted effort, dating back to the Ninetieth Congress, and including presidential veto of bills passed by the Ninety-third and Ninety-fourth Congresses. From such a process of compromise and adjustment, a symmetrical statute containing explicit answers to every question of administrative implementation is unlikely to emerge.

*In Re: Permanent Surface Mining*, 653 F.2d at 522.

OSM's interpretation of the 1977 regulations, therefore, and of the statute as set forth in the revised regulations, must be accorded broad deference unless the record reflects that the agency's interpretation is "plainly erroneous", *Udall*, 380 U.S. at 17, 85 S.Ct. at 801, or patently "inconsistent" with the earlier regulation. To determine whether deference should be accorded the Secretary in this instance, two questions must now be addressed: (1) whether the 1982 regulations are consistent on their face with the language of the statute and of the 1977 regulations; and (2) whether the 1982 regulations are reasonably related to the legislative intent and purpose of the SMCRA.

2. *Consistency with Statutory Language*

■ 30 U.S.C. § 1232 states that a reclamation fee of 35 cents per ton of "coal *produced* by surface coal mining" shall be levied on all coal operators. Emphasis added. The term "produced" is ambiguous. "Production" could reasonably be interpreted to include the entire process of extracting and selling coal, complete from pit to buyer's door, or it could refer solely to the process of extraction. The latter interpretation would support the conclusion that impurities added after extraction, such as moisture, should not be taxed. The former interpretation would imply that the gross product sold to the buyer—even if it contains impurities and moisture—should serve as the basis for taxation.

The statute also fails to define the term "coal". Types of coal—such as "lignite" coal, surface mined coal, and underground coal—are distinguished, but nowhere does the Act specify what elements comprise a "taxable" piece of coal.

As published in 1978, the 1977 regulations did little to remedy these ambiguities. The 1977 regulations, *see* 30 C.F.R. § 870.-12(b), 43 Fed.Reg. 49940 (1978), state only that

(a) The operator shall pay a reclamation fee on each ton of coal produced for sale, transfer, or use, including the product of in situ mining.

(b) The fee shall be determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator.[6]

The preamble to the 1977 regulations, however, does provide some insight into OSM's interpretative intent. In response to a question from a commentator about whether the fee was to be paid on "clean coal" or "run of mine" coal, OSM stressed that the crucial factor was not the composition of the coal, but the point in the mining and selling process that "first sale or transfer" took place:

Section 837.12(a) and (b) of the regulations specify that the fee be paid on each ton of coal produce for sale, transfer, or use and that the fee shall be determined at the time of initial bona fide sale, transfer of ownership, or use by the operator. For example, if the initial transaction is based on the weight of run-of-mine coal then the reclamation fee must be paid for each ton of run-of-mine coal sold, transferred or used. If the initial transaction is based on the weight of clean coal, then the reclamation fee must be paid on each ton of clean coal sold, transferred, or used.

quoted in full *infra* Part III B, n. 9.

---

**6.** The 1977 regulations also include an "attempted" definition of coal. *See* 30 C.F.R. § 700.5,

42 Fed.Reg. 62714, Dec. 13, 1977 (Dec. 13, 1977). Significantly, this interpretation of the 1977 regulations was reiterated one year later, in 1978, in an OSM Solicitor's opinion:

> ... The fee must be determined by the weight and value of the coal at the time of initial bona fide sale. More [sic] computations or estimations of the clean coal weight would not be in compliance. The coal would actually have to be cleaned prior to sale or use to meet the conditions in Section 837.12(b).

Advisory Opinion of Apr. 17, 1980, *quoted in* Plaintiff's Supp. to Admin. Record, Attachment 3 at 3.

The 1982 revised regulations adopt the first of the two possible interpretations of section 1232. The regulations state expressly that the time of sale, and not the value of the coal, is the determining factor. Impurities that have not been removed before the time of initial bona fide sale, transfer of ownership, or use by the owner, will be taxed.

Both interpretations, however, are potentially consistent with the Act. The conclusion reached depends upon the particular objectives that Congress sought to further in enacting the legislation. If, for example, the Act's drafters intended to create a tax mechanism that would promote administrative efficiency and ensure consistent, even-handed enforcement, the first interpretation is reasonable, for it envisions a flat tax based on a uniform time of sale. If, however, Congress hoped to tax operators based solely on the value and quantity of coal extracted, then the latter interpretation would be most logical.

At one extreme, therefore, the 1982 regulations are not *in* consistent with the plain language of the statute or its supporting regulations. They simply make express what had been implied. Because the SMCRA does not contain an express provision to the contrary in the SMCRA, there is nothing "plainly erroneous" about interpreting "coal produced" to refer to the condition of the coal at the time of sale or transfer. At the other extreme, the 1982 regulations may be viewed as *consistent* with an interpretation of section 1232 that OSM represented as its own from 1977 until 1981. *See* Solicitor's Advisory Opinion of Apr. 17, 1980; preamble to 1977 regulations, 42 Fed.Reg. 62714 (Dec. 13, 1977). That this interpretation was not the only one possible is of minor consequence. *See Udall*, 380 U.S. at 16, 85 S.Ct. at 801. For purposes of this review, what matters is that the 1982 regulations were potentially consistent with a plausible—indeed, reasonable—interpretation.

In neither event, therefore, under either of the two possible interpretations, can the 1982 regulations be considered clearly inconsistent with the plain meaning and language of the statute.

### 3. *Consistency With Legislative Purpose*

■ In its 1977 House Report, Congress listed the objectives of the reclamation program as including

> the protection of health or safety of the public; protection of the environment from continued degradation and conservation of land and water resources; the protection or enhancement of public facilities as part of reclamation of land and water conservation projects; the improvement of lands and waters to a suitable condition useful in economic social development; and research and demonstration relating to the development of surface mining reclamation and water quality control program methods.

H.R.Rep. No. 95-218, 95th Cong., 1st Sess. 169; U.S.Code Cong. & Ad.News 593, 700 (1977). An earlier House Report that accompanied the SMCRA made clear that the reclamation fund provisions were designed to be remedial in purpose and function:

> [T]he widespread environmental degradation associated with coal surface mining—including the indiscriminate dump-

ing of coal mine waste on the land surface and into streams—has resulted in the serious deterioration of the social and economic climate of affected regions. Where states have not accepted the burden of rehabilitating these regions, the environmental and social costs have devolved upon local residents. The injustice of requiring persons least able to shoulder such an enormous burden to do so is obvious.

H.R.Rep. No. 93–1072, 93d Cong., 2d Sess. 116 (1974). It was considered critical, therefore, that the fee provisions generate sufficient revenue to fund the Abandoned Mine Program. *See id.* at 117. Early reports estimated that as much as $180 million per year would be needed to meet "high priority program needs." *Id.*

The bill's sponsors, however, hoped to find a way to impose a reclamation fee without "constrain[ing] the development or production" of coal:

Several principal considerations form the basis for the ... reclamation fee:

First, to set the fee at such a level that it is not a burden on the industry;

. . . .

Third, to structure the fee so it would not exert an inflationary influence in the economy.

H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 136, 137; U.S.Code Cong. & Ad.News 593, 668–69 (1977). To achieve this end, Congress devised a differential fee based solely on the genus of coal mined. Types of coal were limited to three: surface mined coal was to be taxed at 35 cents per ton; underground mined coal at 15 cents per ton; and lignite coal at 10 cents per ton. *See* 30 U.S.C. § 1232(a). Significantly, Congress expressly *rejected* an amendment to the reclamation fee provisions that would have provided for a uniform tax based on the BTU content (energy value) of the coal, *see* H.R.Rep. No. 93–1072, 93d Cong., 2d Sess. 116–17 (1974) (proposing fee of 1.23 cents per million BTUs), and *rejected* proposed admendments that would have permitted credits or deductions for state severance tax payments that, in turn, either provided for excess moisture deductions or were based on BTU value. *See* 120 Cong.Rec. H25230 (July 25, 1974) (amendment of Congressman Seiberling proposing a tax of $2.50 per ton of coal mined minus a credit of $0.01 for each 1000 BTUs "by which the weighted average BTU value of coal mined ... falls below 16,000 BTU per pound"); 121 Cong.Rec. H6809 (Mar. 17, 1975) (amendment of Congressman Regula proposing a credit for "the amount of any reclamation fee or severance tax ... paid to the State during that year.").

This decision to base the fee on the weight of the coal at a given *time* during the coal production process, and not on the value or "inherent content" of the coal, was not an arbitrary choice unsupported by logic or reason; to the contrary, by focusing on uniformity of application rather than value Congress furthered three legitimate and important governmental interests.

First, the time-based tax ensured that the Abandoned Mine Reclamation Fund provisions would be enforceable. Clearly, a BTU tax, or any tax requiring a determination of moisture content, possesses the inherent liability of entangling federal authorities in the complicated process of overseeing testing for impurities. A tax based on gross weight at a definable point of time in the production process, however, avoids this problem because it eliminates the need to test. Second, by selecting an enforceable tax, Congress ensured that the funds necessary to conduct the program would be available. Given Congress' concern that the cost of rehabilitating environmentally degraded areas not fall upon the shoulders of those [citizens] least able to afford it, *see supra,* H.R.Rep. No. 93–1072, 93d Cong., 2d Sess. 116 (1974), the mine program's financial health was of critical importance. Third, by selecting a *time*-based tax Congress avoided the need to "choose [arbitrarily] between impurities". If excess moisture were a deductible impurity, opera-

tors might argue, why not also deduct the weight of other impurities, such as sulphur, dust, or debris. Once caught in a technical debate over the "true" elements of "pure" coal, there might, conceivably, be no end to the deductions claimed. To permit such a situation would jeopardize efforts to meet the costly, remedial purposes of the Act without imposing new taxes—clearly an "inflationary influence,"—on other sectors of the economy. *See* H.R.Rep. No. 95–218, U.S.Code Cong. & Ad.News at 668–69.

The 1982 revised regulations are based on precisely these policy concerns. As discussed *supra*, although the preamble to the 1977 regulations and the Advisory Opinion of April 17, 1980, attempted to clarify the confusion surrounding the 1977 regulations and establish the reclamation fee as *time*, not value, based, the 1977 regulations continued to create uncertainty among operators. In 1980 OSM completed a review of the Abandoned Mine Reclamation Fund Fee Collection Program. The review covered enforcement activities from October 1977 through June 1980, and concluded that inconsistencies in the 1977 regulations had resulted in disparate treatment of coal operators. Specifically, OSM found that the wording of the preamble to the 1977 regulations had created a tax loophole that was currently being exploited by operators in Region II. The preamble stated that the reclamation fee was to be computed "on the weight on which the *initial transactions* was based." Secretary's Record

Supp., Exh. A at 12. The regulations themselves stated only that the fee was to be "based on the *weight at the time* of initial bona fide sale, transfer of ownership, or use by operator." *Id.* By devising contractual terms that permitted the operator to be paid at a higher rate for fewer tons of "clean" or "pure" coal, an operator would pay significantly less under the preamble interpretation because the "weight on which the transaction was *based*" would be the weight of the anticipated *clean* coal. Theoretically, therefore, two operators could tender the same gross weight of coal for sale, and depending on the contractual terms used, one might pay considerably less than than the other. Secretary's Record Supp., Exh. A at 11–13.[7]

In addition to this loophole, the OSM report also found that some operators in Region II were reading the plain language of the regulations to permit excess moisture deductions. Secretary's Record Supp., Exh. A at 10–11. Fearful that these interpretations would significantly and critically deplete the revenues needed to fund the Abandoned Mine Program,[8] thereby jeopardizing the broad, remedial purposes of the Act, OSM moved quickly to draft revised regulations unequivocally defining the fee as *time*, not value, based.

Viewed against this background, it is apparent that the 1982 regulations were promulgated out of a need to ensure uniform enforcement, a workable administrative

---

**7.** OSM identified three possible ways of interpreting the regulations:

"1. The fee has been based on *real* weight of the coal (either run-of-mine or cleaned) at the time of sale.

"2. The fee has been based on the 'calculated' reduced weight (supported by lab analysis), *for which* the operator was *paid*.

"3. The fee has been based on the 'calculated' reduced weight (supported by lab analysis), even when the operator was *not* paid on the basis of fewer tons."

Secretary's Record Supp. Exh. A at 16. Drummond, OSM concluded, followed the third approach, and in so doing exploited a lucrative loophole:

"Drummond fits into the third category. Drummond sells coal by the ton and gets paid more

or less per ton, according to the BTU's per ton. If the coal has more moisture, it has fewer BTU's *per ton*, and Drummond gets paid less per ton. (Note that Drummond does not get paid for *fewer* tons; they get paid less per ton.) Drummond is not the only company to be allowed this deduction; the IG report estimates that such a deduction reduced fees in Alabama by $304,811 over the 33-month period examined, and the FCO estimated that approximately 70 percent of the tonnage reported by operators in that State included an adjustment for excess moisture." *Id.* at 16–17.

**8.** *See supra,* n. 7.

framework, and adequate, "inflation free" funding. As a direct response to those parts of the 1977 regulations that failed to enforce effectively the remedial purposes of the SMCRA, the 1982 revisions are patently consistent with the legislative intent of the Act.

Finally, even were it not possible to identify the original purposes of the Act or analyze their relationship to the stated justifications for the 1982 regulations, the revised regulations would still survive judicial review because the explanation tendered by OSM reflects a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

Under the standard established by the Supreme Court, an agency's action will be found arbitrary and capricious if, *inter alia*, the agency has

> entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), *quoted in Nat'l Ass'n of Patients on Hemodialysis and Transplantation, Inc. v. Heckler*, 588 F.Supp. 1108 (D.D.C. 1984). In this instance, the record does not support the conclusion that OSM entirely failed to consider an aspect of the problem. The rationale tendered to support the 1982 regulations is both reasonable and logical given the evidence of administrative confusion before the agency. More important, one cannot reasonably conclude, in the absence of express statutory language or legislative history to the contrary, that it was "implausible" for the Secretary to assume that Congress was aware of the importance of creating an administratively enforceable tax mechanism—one that would meet the funding needs of the Abandoned Mine Program without requiring overly-intrusive regulation of local operators. To the contrary, it is fair to assume that had Congress wanted to ensure that impurities added during the coal mining process, but not part of the "inherent content" of the coal, would not be taxed, it would have chosen one of the value-based amendments. Congress was free to strike a different type of balance between the needs of compliance and the nature of the tax burden on the coal operator.

In short, the 1982 regulations are neither patently "inconsistent" with nor plainly erroneous in their interpretation of the legislative purposes of the SMCRA.[9] Indeed, the revised regulations reflect governmen-

---

**9.** In support of its position Drummond cites a recent decision by the Third Circuit, *United States v. Brook Contracting Corp.*, 759 F.2d 320 (3rd Cir.1985). In *Brook* the Third Circuit held that the 1982 regulations could not serve as a basis for including "rock, clay, dirt, and other debris in the computation of the reclamation fee." *Brook*, at 327. The court ruled that "[t]o the extent that the government interprets § 870.-12(b) [the 1982 regulations] to authorize imposition of the reclamation fee on noncoal material mined by appellants here, we hold this regulation exceeds the scope of 30 U.S.C. § 1232(a) and is therefore invalid." *Brook*, at 327.

In reaching its conclusion the Third Circuit relied heavily on legislative history indicating that:

"Congress was very much concerned about economic burdens to the economy in general, and the coal industry in particular. Congressional research went to great pains to project costs to the consumers and the industry that would result from implementation of the reclamation fees. These projections strongly suggest that Congress intended to impose the fee on combustible coal only, and not ... on additional tonnages of rock, clay and dirt."

*Brook*, at 325. The legislative excerpts cited in *Brook* refer to cost studies contemplated, or actually undertaken, by Congress. Significantly, however, none of the excerpts noted by the court actually discuss the cost studies in the context of the question at issue here, and at issue in *Brook*. More important, *Brook* curiously ignores the legislative history underscoring Congress' equally pressing concern for the remedial purposes of the Act. As the *Brook* court points out, Congress' purpose in establishing the reclamation fund was to avoid burdening the coal industry and exerting inflationary pres-

tal and agency interests which, in the absence of express language to the contrary, stand on their own as legitimate bases for agency action. As such, the agency's decision to promulgate the 1982 regulations is entitled to substantial deference.

## B. *Prior Practice*

The Supreme Court has held that if an agency "chang[es] its course by rescinding a rule[,] [it] is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicles*, 463 U.S. at 42, 103 S.Ct. at 2866. The Court has also pointed out, however, that " 'regulatory agencies do not establish rules of conduct to last forever.' " *Id.* *quoting American Trucking Ass'ns v. Atchison, T. & S.F.R. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). "[A]n agency must be given ample latitude to 'adapt their rules and policies to the

demands of changing circumstances.' " *Motor Vehicles*, 463 U.S. at 42, 103 S.Ct. at 2866, *quoting Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968). When faced with "new developments", an agency "may alter its past interpretation and overturn past administrative rulings and practice." *American Trucking*, 387 U.S. at 416, 87 S.Ct. at 1618. Regulatory agencies "are supposed, within the limits of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Id.*

Drummond contends that the 1982 revised regulations represent a change in OSM's "policy and practice" for which a reasoned justification is required. It is Drummond's position that the Secretary

---

sures on the economy, *as well as* "providing sufficient funds for meeting program objectives within a reasonable time frame." H.R.Rep. No. 218, 95th Cong., 1st Sess., 170, reprinted in 1977, U.S.Code Cong. & Ad.News 593, 672; *see supra* at Part III A 3. Congress's goal was to satisfy *all* of these concerns. An objective analysis, therefore, must consider *all* of the legislative history. Because Congress did not expressly discuss whether the fee actually agreed upon (35 cents per ton) would constitute an undue burden on the coal industry or the economy if based on a definition of coal that included impurities, we respectfully disagree with the conclusion that legislative history focusing solely on a "concern for costs" is either persuasive or dispositive of the issues involved in this case. To the contrary, it would appear that had a concern for "burdens to the industry" been of paramount concern to Congress, proposed amendments basing the fee on the BTU content of the coal would not have been rejected in favor of the current "flat tax" approach.

Viewed in this light, then, the legislative history suggests that the remedial purposes of the Fund, and the need to rehabilitate those regions unable to absorb the costs associated with surface mining, were the focus of Congress' concern. The 1982 regulations are reasonably consistent with this purpose.

In reaching its conclusion, *Brook* also relied on the definition of coal as promulgated by the Secretary in 30 C.F.R. § 700.5:

"As used throughout this chapter, the following terms have the specified meaning except where otherwise indicated—

. . . .

"Coal means combustible carbonaceous rock, classified as anthracite, bituminous, subbituminous, or lignite by ASTM Standard D 388–77, referred to and incorporated by reference in the definition of "anthracite" immediately above." Because this definition does not expressly include impurities, the court reasoned that impurities could not reasonably be included in the term "coal produced by surface mining." 30 U.S.C. §§ 1201.

The Secretary correctly points out, however, that the definition of "coal" is irrelevant to the question at issue here. The regulatory scheme challenged in this instance assesses the reclamation fees based on weight at a given time, not based on value. The focus of this Court's analysis need only address the reasonableness of that scheme. If valid reasons exist to support the Secretary's decision to base this tax on "time" rather than "value", the manner in which coal is defined in section 700.5 clearly is not dispositive of the central issue. Of course, precisely the opposite would be true if Congress had in fact intended to base the tax on the inherent value of the coal mined. *Cf. A.J. Taft Coal Co. v. United States*, 605 F.Supp. 366 (N.D.Ala.1984), *aff'd without opinion*, 760 F.2d 280 (11th Cir.1985) (distinguishing *Drummond* as a case that, unlike *Taft*, (1) does *not* involve the interpretation of a "statute and regulation which make reference only to coal", and (2) does not involve a tax based on the coal's BTU value).

has failed to provide the necessary "reasoned analysis." *Motor Vehicles*, 463 U.S. at 42, 103 S.Ct. at 2866.

Based on the record before the Court, there is little evidence to support the claim that the 1982 regulations represented a change in OSM policy on the *national* level. In the preamble to the 1977 regulations, discussed at length, *supra*, OSM clearly stated that the reclamation fee would be based on the gross weight of the coal in its current condition—with or without impurities—at the time of initial sale, transference, or use. Subsequent policy explanations released between 1978 and 1980 were largely consistent with this basic position. *See e.g.* Solicitor's Opinion of Apr. 17, 1980, cited in Drummond's Supp. to Admin. Record, Attachment 3 at 3 (discussed *supra*, Part III A 2). No official statement dealing with OSM's national policy may be found to the contrary in the administrative record.

OSM's practice and policy at the local level, however, is more complicated. According to the Secretary, only 12 of approximately 6000 coal operators nationwide claimed a moisture deduction. Defendant's Mem. at 4. Of those who claimed deductions, all but one were located in Region II. Affidavit of Jane S. Robinson, Secretary's Record Supp., Exh. E.[10] The Secretary cannot be bound, the defendant argues, by the action of maverick officials in Region II.

Drummond correctly points out that the 1981 Inspector General's report, drafted for the Assistant Secretary of the Interior and the Associate Solicitor, however, specifically found that "[t]he [1977] regulations concerning reclamation for computations are subject to various interpretations" and that "[a]s a result, the regulations have not been applied consistently by both the coal industry and OSM fee compliance personnel...." Secretary's Record

Supp., Exh. A at 10. *See also* Drummond's Supp. to Admin. Record, Attachment 1 at 4. Other reports drafted by OSM personnel concede that "OSM has never disallowed ... a deduction [for excess moisture]; we simply never gave it to anyone who did not ask for it." Drummond's Supp. to Admin. Record, Attachment 3 at 4. It is Drummond's position that the defendant's admitted failure to deny a single request for a deduction amounted to a prior practice or policy to permit deductions when asked. Insofar as the 1982 regulations altered this "prior policy", without justification, Drummond concludes, the Secretary's decision to issue the revised regulations was arbitrary and capricious.

Drummond's argument is flawed in several respects. First, on the basis of the record here it is difficult to conclude that OSM knowingly and deliberately altered a prior practice. All but one of the excess moisture deductions were authorized by fee compliance officers in a single region—Region II. There is no indication that either senior OSM officials or the Secretary's Office learned that the deductions had been authorized for Alabama operators by the Region II Compliance Chief until well into 1981 when Steven Griles, Deputy Director of OSM, requested W. Hord Tipton, Acting Regional Director of Region II, to investigate the treatment of moisture deductions in Region II. *See* Drummond Supp. to Admin. Record, Attachment 2, Tipton letter of Aug. 6, 1981, at 1. Upon learning of Region II's policy and discovering general uncertainty over the proper interpretation of the 1977 regulations, OSM moved quickly to correct Region II's deviation and clarify the regulations. In short, once OSM was made aware of the problem, remedial action was taken relatively promptly. The record does not support the conclusion that senior OSM officials in Washington knowingly endorsed a policy of permitting moisture deductions.

---

**10.** According to the affidavit, a fee compliance officer in Pennsylvania permitted an operator to take a deduction on one occasion. Affidavit of

Jane E. Robinson, Secretary's Record Supp., Exh. E at 2.

**1504**

■ Indeed, as a matter of law, the activities of insubordinates or misinformed government officials generally will not bind the government. *See Federal Crop Ins. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) ("anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority"); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (government not estopped from enforcing regulation where social security claimant given erroneous information by government field representative); *cf. Boggs v. Regan,* Civil Action No. 79–1090 (D.D.C., decided Sept. 18, 1981) (*Hansen* distinguished on grounds that plaintiffs made "every effort to obtain information from all sources *including the responsible decisionmakers.*" Slip op. at 5 (emphasis added)). In this instance, therefore, the activities of OSM officials in Region II can not properly be attributed to the Secretary. Because Drummond and the other Alabama operators who requested moisture deductions did not seek advice from the highest levels of OSM, they were in effect charged under the law with knowledge of the proper meaning and intent of the 1977 regulations. Viewed from this perspective, it is difficult to find that OSM ever altered its practice, for without knowledge or legal responsibility for Region II's activities the Secretary could not have authorized excess moisture deductions.[11]

Yet, even if Region II's activities can be attributed to the higher levels of OSM,

Drummond's argument remains flawed for a second reason. In cases where a reasoned justification for a policy change has been required, the agency involved made a distinct and decisive break from an affirmatively established rule or regulation. *See, e.g., Motor Vehicles* (rescinding an agency rule requires reasoned justification); *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486 (D.C.Cir.1984) (agency decision to return to old ICC rate base requires reasoned justification).

In this case, however, there is no distinct, affirmative policy from which the 1982 regulations may be said to have deviated. OSM concedes that it never *denied* a deduction when requested, but it is also apparent that OSM never asserted in regulations, comments, or policy statements, that moisture deductions were permissible. Indeed, all of OSM's official pronouncements implied the opposite. In short, the lack of a consistent practice at the local level argues not for the conclusion that OSM had a prior practice different from that required by the 1982 revised regulations, but rather that OSM had no real policy at all at the local level.

Third and finally, even if the actions of OSM officials in Region II can be held to constitute a "prior practice" that may be imputed to the Secretary, the promulgation of the 1982 regulations represented a legitimate, justifiable response to the "demands of changing circumstances." *Permian Basin,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). It is clear from the record that the confusion which developed in Alabama

---

11. In support of its argument that the Secretary's interpretation of the Act is not entitled to deference, Drummond argues that the Secretary's interpretation is not "contemporaneous with enactment of [the] SMCRA." Plaintiff's Mem. at 15. Judicial deference to an agency interpretation, Drummond concludes, is "not warranted where t[he] interpretation is not contemporaneous with enactment of the statute [citing *General Electric v. Gilbert,* 429 U.S. 125, 142–43, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1975); *Northern Colorado Water Conservancy District v. FERC,* 730 F.2d 1509, 1519–20 (D.C.Cir.1984)]". *Id.*

To the extent that the Court now concludes OSM's current interpretation of the Act does not conflict with the prior administrative practice "begun when that statute became law," *id.,* Drummond's "contemporaneous" argument is essentially moot. Even were the Court less convinced that Region II's activities cannot be attributed to the OSM' *national policy,* the absence of any clear or consistent policy at the local level would militate against overturning the agency's decision on the grounds that the interpretation was "contemporaneous" with the enactment of the SMCRA.

over the 1977 regulations represented an unexpected but serious threat to the Abandoned Mine Reclamation Fund Program. Given the broad, remedial purposes of the Act, the need to insure continued funding for the program, and Congress' clear intent to establish an administratively enforceable regulatory scheme that would not be based on a BTU or impurities-credit fee system, it was not unreasonable for OSM to promulgate new regulations designed to clarify the old. All of these reasons for the 1982 revisions—discussed at length *supra*—are contained in the administrative record. *See* Inspector General's Report, Secretary's Record Supp., Exh. A; Drummond's Supp. to Admin. Record, Attachments 1, 3.

## IV. *Conclusion*

After a "careful and searching inquiry into the record ... to assure itself that the agency has examined the relevant data and articulated a reasoned explanation for its action," *Farmers Unions*, 734 F.2d at 1499, the Court concludes that a rational connection exists between "the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

Because the revised regulations are consistent with the plain language and purpose of the SMCRA, and because the challenged regulations do not constitute a change from a prior administrative policy or practice, the Secretary's interpretation of the SMCRA and the 1977 regulations is entitled to broad deference. Based on this record, the plaintiff has not met its burden of establishing that the challenged agency action was arbitrary and capricious.[12]

Accordingly, for the reasons set forth above, summary judgment must be granted in favor of the defendant. A separate Judgment accompanies this Memorandum Opinion and Order.

12. The Court notes that as a practical matter this decision need not work an undue hardship on the plaintiff. As the District Court in Alabama pointed out, there is nothing in the new regulations that would prevent an operator from removing impurities *before* the initial bona fide sale, transfer, or use. If Drummond chooses to clean or dry the coal before the coal is treated, there will be no tax on excess moisture or other impurities.